320 So.2d 614 (1975)
Succession of Miss Edna C. HAUSSER.
No. 6956.
Court of Appeal of Louisiana, Fourth Circuit.
October 9, 1975.
Rehearing Denied November 11, 1975.
Writ Refused January 7, 1976.
*615 Guy B. Scoggin, Legier, McEnerny, Waguespack, Kuhner & Scoggin, New Orleans, for J. Clarence Hirsch.
P. Fred Siegel, New Orleans, for Gerard Hausser.
C. Ellis Henican, Jr., New Orleans, J. Wayne Mumphrey, Chalmette, for Margaret A. Chutz, Lavinia Alice Chutz, John Alvin Chutz, II and Gerard A. Chutz.
Felicien Y. Lozes, New Orleans, for Allan Jaffe and E. Lorenz Borenstein.
Before REDMANN, LEMMON, GULOTTA, BOUTALL and SCHOTT, JJ.
REDMANN, Judge.
The legatees of the proceeds of testatrix's immovable property appeal from the dismissal of their opposition to a private sale of decedent's home in the New Orleans Vieux Carre proposed by the executor. The legatees oppose the proposed sale for $100,000 cash because $110,000 cash had been offered (about two weeks after the first offer). We sustain their opposition and reverse.
Testatrix died December 14, 1973. Her will named her "friend and long-time adviser, J. Clarence Hirsch," her executor. The will provides: "I hereby instruct my executor to convert into cash, under the circumstances which, in his judgment, seem to be most appropriate, all my real estate, and the net proceeds therefrom, I give and bequeath" to opponents (70% to one and 6% to each of the others).
Execution of the will was delayed by an attack on its validity by a niece, who was left the same 6% portion of the immovable proceeds as great-nieces and great-nephews. While that attack was pending the executor received inquiries about the property from both offerors here involved (and other persons as well), but declined to negotiate because of the attack on the will. The attack was dismissed on joint motion with prejudice on October 9, 1974.
On October 23, 1974, the attorney for interests which owned an adjacent small hotel contacted Hirsch to reassert interest *616 in purchasing. However, the attorney explained that a "hotel moratorium" required assurance from City and Vieux Carre Commission authorities that the property could be used as intended, and for this reason a firm offer could not immediately be made. Hirsch advised this prospective purchaser to "fish or cut bait" within the remaining two days of that week. On October 29, Hirsch received and accepted (subject to court approval) the $100,000 cash offer, which was an acceptable offer in his judgment as an experienced real estate agent. On November 11, the adjacent hotel owners made an unconditional offer of $110,000 cash in the name of a newly-formed corporation (with other terms of the offer being identical to those of the $100,000 offer, including a 10% cash deposit immediately upon acceptance).
When the executor nevertheless sought court approval of the proposed $100,000 sale, this opposition by the legatees resulted.
We first note that, as legatees (affected by the sale), opponents are expressly authorized by law, C.C.P. 3283, to oppose the sale. Accordingly this case is not affected by Succession of Senkpiel, 1955, 227 La. 516, 79 So.2d 866, and Succession of Lustig, La.App. 1959, 112 So.2d 760, which held third-party offerors unauthorized to oppose a private sale. Our executor cites especially Lustig's reasoning that "the Courts would be forced to accept bids, through written oppositions, ad infinitum. . . causing great delay in expeditiously handling" the succession. As to that reasoning, we observe that in Senkpiel the opposition, although disallowed, in fact caused a higher bid by the original offeror, and that that higher bid was the price fixed by the court for the sale. Thus the supreme court in Senkpiel did not share Lustig's apprehension over auction-by-opposition. See also Succession of Voland, La.App.1974, 296 So.2d 406, writ refused, La., 300 So.2d 184, indicating that the court can authorize the sale at a higher price than that advertised. On another possible effect of disallowed opposition, see In re Standard General Realty Co. Inc., La.App.1965, 173 So.2d 862, in which testimony on value by a dismissed opponent defeated the proposed sale.
We second note that opponents did not propose that a substitute sale be made, to the offeror of $110,000 (whose offer by its terms was irrevocable only through November; the trial court hearing was November 29, and judgment was December 19). However, if it be preferable for opponents whose opposition is based solely on a higher offer to ask the court not only to refuse approval of the lower offer but to grant approval for acceptance of the higher offer (as in Voland, thus avoiding Lustig's, concern over auction-by-opposition), we find no authority obliging opponents to do more than simply oppose on the basis of the higher offer. To the contrary, In re Standard General Realty Co. Inc., supra, rejected a proposed private sale because the price was too low, while also rejecting attempted oppositions from third parties who wanted to offer higher prices.
We therefore consider the question to be whether the sole legatees of property's proceeds can successfully oppose a private sale at one price by showing only that a higher price has since been offered (although by the time of this appeal that offer has expired).
We deem it a basic and self-evident principle, founded on due process concepts, that interested heirs, legatees or creditors may not be forced to suffer a loss by a private sale of succession property by the succession representative for the lower of two prices offered on otherwise identical terms. This principle cannot be affected by the testatrix's direction to her executor to sell "under the circumstances which, in his judgment, seem to be most appropriate."
The executor's interpretation of his testamentary authority to support the lower-priced sale is defeated by C.C. 1573:
"The custom of willing by testament, by the intervention of a commissary or attorney in fact is abolished.

*617 "Thus the institution of heir and all other testamentary dispositions committed to the choice of a third person are null, even should that choice have been limited to a certain number of persons designated by the testator."
Because of art. 1573, a testator cannot directly authorize his executor to donate the testator's property to undesignated persons; and the testator cannot indirectly do so, by authorizing his executor to "sell" property (to undesignated persons) at whatever price pleased the executor, irrespective of market value. Such an authorization would allow the executor to select a donee of part of the value of that property, by "selling" at, say, 10% of value, by which device the executor would effectively donate 90% of value to the "purchaser" (or, selling for 90%, thus donating 10%). (Compare Succession of Baldwin, La.App. 1975, 309 So.2d 808, annulling a will's provision that "checking account [and two savings and loan association certificates] be handled as [the executrix] sees fit.")
In our case, the testatrix herself named several legatees to receive only 6% each of the cash proceeds of her property: if her instructions to the executor are interpreted to authorize him to sell for $100,000 [why not $75,000? or $50,000?] in the face of a $110,000 offer, then that authorization enables him to select a stranger to be a beneficiary of $10,000 of value from the succession ($110,000 of property for $100,000)and that $10,000 is more than the 6% that some legatees named by the testatrix herself will receive from the property.
Therefore we reject the executor's interpretation of the testamentary language as an authorization to him to sell for whatever price (or even whatever reasonable price) he wishes, and specifically for the lesser of two prices offered on otherwise identical terms.
The executorhimself a real estate broker by professionexpressed concern that he could not consider a later offer after having accepted (subject to court approval) an earlier offer. In our view, that the succession representative had already conditionally accepted the first offer prior to receipt of the second is immaterial. He owes no obligation to the first offeror other than to present the offer to the court, and he owes this obligation only in his capacity of succession representative. The succession representative, unlike a broker, does not become the agent of both seller and buyer, but remains the representative of the succession exclusively, obliged only to the succession, and for the benefit of its creditors, heirs and legatees. "A succession representative is a fiduciary with respect to the succession . . .," C.C.P. 3191, who "cannot in his personal capacity or as representative of any other person make any contracts with the succession. . .," art. 3194 (emphasis added). Thus, even after conditionally accepting an offer, the succession representative cannot have any contractual relationship as the representative of the offeror. If, as in our case, a more advantageous offer is received after a first offer had been conditionally accepted, the succession representative has no obligation to the first offeror to reject the second offer. (One evident alternative, ordinarily, is to accept the second offer on the condition that the court both reject the first and approve the second offer.)
It could occur that a second offer should be rejected, because the second offeror is irresponsible. Even if the higher offer promises a 10% cash deposit immediately on acceptance and the deposit is actually made, it is supposable that the succession could lose by accepting the higher offer. In our case, for example, the forfeit of an $11,000 deposit might not overcome actual loss, if no other $100,000 offer could later be obtained and the property had ultimately to be sold for less than $89,000.
*618 (But query, whether such a loss is of any concern to the executor, when the legatees are all competent and unanimously oppose the $100,000 offer.)
In fact our higher offer did come from an "irresponsible" offeror, in the sense that the offeror was a newly-formed corporation without assets of its own. However, the uncontradicted testimony of its agent was that he had a cashier's check for the $11,000 deposit from his mother, the corporation's sole shareholder, who was also prepared to provide the balance of the price. In the absence of a showing that the two offers of $100,000 and $110,000 were substantially above marketa showing of a likelihood that a later sale would bring a price of less than $89,000the fact that the corporation which would have deposited $11,000 was otherwise judgment-proof does not by itself suffice to authorize the executor (or the trial court) to reject the $110,000 offer.
Much less should the higher offer be rejected when all the interested legatees are legally competent and unanimously oppose the sale at the lower price, and no creditor's interest is affected.
Although the $110,000 offer expired while the rule was under advisement in the trial court, the legatees by this appeal have unanimously persisted in their opposition to the $100,000 sale. They do run a risk of ultimate loss if they defeat this $100,000 sale, and the property cannot later be sold for an equal or greater price. But it is their risk, and not the executor's risk nor any creditor's risk.
We may even assume that the trial court disbelieved the testimony of the corporate offeror's agent that he had an $11,000 cashier's check from the corporation's sole shareholder. The same reasoning applies: the risk is that of the legatees.
There may be limits on legatees' or heirs' rights to defeat a proposed private sale by the succession representative. Presumably the existence of creditors entitled to prompt payment might require approval of a sale at a price the heirs deem low. Presumably a showing that the property had been advertised for a lengthy period and that no better offer had been made might similarly justify approval of a sale opposed by the heirs, in order ultimately to bring the succession proceeding to a reasonably prompt conclusion. Even the necessity to pay death taxes, if shown despite the available procedures of estimate and extensions, might overcome the heirs' opposition. And, of course, lack of unanimity or competency among the heirs would eliminate entirely the argument that the heirs have the right to take the risk of losing a certain sale in the hope of a better sale.
None of these circumstances were shown to be present here. The legatees are competent and unanimous; death taxes were not shown to be pressing (although 12 months had passed since the death);[1] the property had been on the market only 20 days after termination of the will contest; there are no unpaid creditors (we do not decide how the will charges debts, to movables or immovables). We find no justification in our circumstances for rejecting these legatees' unanimous opposition to this private sale.[2]
We finally add that, despite argument on the point, we do not consider whether the *619 executor is entitled to a real estate agent's commission (either in addition to, or in lieu or as a measure of, executor's commission; see C.C.P. 3194, 3351 and 3353). The parties agreed on oral argument that this question would be decidable upon final account.
The judgment appealed from is reversed, and the opposition to the executor's application for authority to sell under the October 29, 1974 agreement is sustained.
SCHOTT, J., dissenting with written reasons.
SCHOTT, Judge (dissenting).
On December 18, 1973, these proceedings were initiated on a petition to probate decedent's last will and testament and to qualify J. Clarence Hirsch as testamentary executor. Soon after he was appointed, the executor was met with a petition filed by one of the appellants, Lavinia Alice Chutz, attacking the validity of the will. These proceedings were terminated on October 9, 1974, by a joint motion of all parties and consent judgment dismissing the petition attacking the will.
In the meantime the executor had secured authority to manage the real estate included among the assets of the succession and he had secured homologation of a first tableau of distribution reflecting receipts of some $6,238 and disbursements of some $3,428, including some $1,881 in connection with decedent's last illness and burial expenses. The executor was otherwise engaged in active litigation over the validity of the will, and until the termination of that litigation was prevented from administering the business of the succession in an orderly and expeditious manner.
The sworn descriptive list of the succession assets included the following:

Household furnishings and
personal effects $585.00
Cash in Banks 3,012.71
Homestead accounts 24,711.63
Miscellaneous 1,057.44
Real Estate 228,400.00
 ___________
 Total $257,866.78

The real estate consisted of six pieces in the City of New Orleans, including the piece at 733 Toulouse Street valued at $75,000.
On October 29, 1974, the executor accepted the offer to purchase the property on Toulouse Street and filed his application for court approval on October 31. This offer was opposed by appellants and its homologation is under attack in these proceedings.
When the executor accepted the responsibility as such he became a fiduciary with the duty of collecting, preserving and managing the property of the succession in accordance with law. He was to serve as a prudent administrator, personally responsible for all damages resulting from his failure so to act. LSA-C.C.P. Art. 3191.
*620 Other articles of the Code prescribe various penalties for his failure to follow the law. See comment (b) to Art. 3191. One of his duties is "to close the succession as soon as advisable." C.C.P. Art. 3197. He also undertakes the obligation to pay federal estate tax, 26 U.S.C.A. § 2002, and becomes personally liable for the payment of such taxes. See Herson v. Mills, D.C.D.C. 1963, 221 F.Supp. 714.
It appears from the descriptive list that this succession will probably have some liability for federal estate tax. Assumption of executor's responsibility carries with it not only liability for the payment but also the obligation to make the payment within nine months after the date of decedent's death, subject to his right to request extensions of time in which to make such payment. 26 U.S.C.A. § 6075.
The will does not make perfectly clear who is liable for the debts of the decedent. It provides in part as follows:
"I hereby require that all my debrs be paid.
"I further require that each legatee, hereinafter named pay his or her share of State Inheritance Taxes, and his or her proportionate share of any Federal Estate Tax which may be due by my estate.
"After the payment of my debts, administration expenses, including Executor's commission and attorney's fees, I give and bequeath all the balance of my estate, except the real estate, as follows:
[The names of three religious institutions]
"I hereby instruct my Executor to convert into cash, under the circumstances which, in his judgment, seem to be most appropriate, all my real estate, and the net proceeds therefrom, I give and bequeath as follows:"
There follows the names and addresses of appellants herein.
It may be that the decedent intended for all of her debts and expenses of administration to be taken from her cash and movables with the residual therefrom going to the three religious institutions, but she may have intended instead that all debts and expenses of administration are to be apportioned among not only the religious houses but appellants as well. The executor cannot ignore this as a possible interpretation and a corresponding complication in the execution of the will. In any event, appellants are liable for perhaps considerable amounts, not only for federal estate taxes but also for state inheritance taxes.
Thus, when the executor filed his application to sell the property at private sale provoking appellants to oppose the application, there was a great deal to be done in the administration of the succession and in the execution of decedent's will. The performance of these duties had already been delayed because of the litigation initiated by one of the appellants herein.
The executor had accepted an offer to sell the property for $100,000, he was holding a $10,000 cash deposit, and he had applied for the court's approval to sell the property when the second offer was made. The delays incident to publication had run when appellants' opposition came to trial. It is emphasized that by the time the judgment was signed, homologating the executor's application, the offer championed by appellants had expired and there was no assurance that a deposit would be forthcoming if this now expired offer were accepted. The effect of the majority opinion is to tell the executor to give up on an agreement which will provide the succession with $100,000 secured by a $10,000 deposit in the hope that this unsecured second offer can be resurrected and processed with attendant delays and much uncertainty as to success in the end.
The majority's willingness to permit this result is based primarily on the hypothesis *621 that appellants are the only persons who have any real interest in the amount the property brings. If the second offer cannot be resurrected for any reason including irresponsibility on the part of the second offeror the majority holds that this is of no concern to the executor. This approach is dramatically demonstrated with the majority statement that even if the trial court attached no credibility to the testimony of the agent for the second offeror that he had a cashier's check for $11,000 to serve as a deposit on the second offer, the court should have maintained the opposition anyway since the risk was exclusively on the opponents-appellants. Under this reasoning the executor had no right to function except as an agent for the appellants, a role not at all consistent with the provisions of the law which are cited above.
I believe that the testamentary executor had a real interest in seeing to it that the sale which he had entered into subject to court approval be carried out without any more delay and that the overall business of the succession be completed expeditiously.
Considering the great delays which have already been encountered in the administration of this succession, the length of time already passed since the executor assumed his responsibilities and his present ability to complete a sale without delay under the security of a substantial deposit, I believe the trial judge properly exercised his discretion in dismissing the opposition. I believe that homologation of the executor's application was in the best interest of the succession and I would affirm the judgment of the trial court.
I respectfully dissent.
NOTES
[1] Evidently at some ultimate time the death tax collectors themselves might cause the sale of succession property to pay the taxes, despite any objection by the legatees, and arguably the executor's obligation to pay the taxes might give him a derivative right to override the wishes of the legatees. But that ultimate time does not occur 20 days after the will contest ends. The tax collectors could not themselves have forced a sale so swift: and the executor cannot claim entitlement to do so in the name of paying taxes.
[2] We note also that C.C.P. 3031-3033 entitle residuary legatees to be placed in possession even over the opposition of the executor. The term "residuary legatees" in the Code of Civil Procedure includes legatees under a universal title, C.C.P. 2826, and therefore includes legatees of all or a proportion of all of the immovables, C.C. 1612. Every legacy is "either universal, under a universal title, or under a particular title," C.C. 1605, and since a legacy of the sale proceeds of all or a portion of all the immovables seems to be neither universal nor under a particular title, it appears to be a legacy under a universal title, as is the legacy of the immovables themselves. (Compare Succession of Meyer, 1941, 198 La. 53, 3 So.2d 273, concluding that a legacy of the disposable portion is one under a universal title.) Thus the legatees of the proceeds of all the immovables might be entitled on their joint demand to be placed in possession even over the opposition of the executor, under C.C.P. arts. 3031-3033 (if all residuary legatees accepted the succession unconditionally, art. 3031). (The executor's entitlement to compensation is protected by art. 3033.) In such a case, the legatees might therefore have the right to prevent any sale at any price by demanding possession. This greater right would include the lesser right of preventing a proposed sale at a price they deem too low.

We also observe that unanimous legatees might insist that they themselves be allowed to "buy" or take on the basis of the price proposed by the executor andsince the net price belongs to themselvespay nothing but the allocable charges.